UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:08-CV-248-D

| LINDA L. JENKINS, | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff | ) |  |
|  | ) |  |
| v. | ) | **MEMORANDUM AND** |
|  | ) | **RECOMMENDATION** |
| MICHAEL J. ASTRUE, | ) |  |
| Commissioner of Social Security, | ) |  |
|  | ) |  |
| Defendant. | ) |  |
| _____ | ) |  |

This matter is before the Court on the parties' cross motions for Judgment on the Pleadings **[DE's 15 & 17]**. The time for the parties to file any responses or replies has expired. Accordingly, these motions are now ripe for adjudication. Pursuant to 42 U. S. C. § 405(g) and § 1383(c)(3), the underlying action seeks judicial review of the final decision by the Defendant denying Plaintiff's application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). This matter has been referred to the undersigned for the entry of a memorandum and recommendation. For the reasons set forth herein, the undersigned RECOMMENDS that Plaintiff's Motion for Judgment on the Pleadings **[DE-15]** be GRANTED and the Defendant's Cross-Motion for Judgment on the Pleadings **[DE-17]** be DENIED.

## Statement of the Case

Plaintiff applied for DIB and SSI on August 15, 2003, alleging that she became unable

to work on July 24, 2003. [Tr. 65-88, 97]. These applications were denied at the initial and reconsideration levels of review. [Tr. 30-40, 43-53]. A hearing was held on June 20, 2007, before an Administrative Law Judge ("ALJ") who found Plaintiff was not disabled during the relevant time period in a decision dated June 28, 2007. [Tr. 16-24]. On April 17, 2008, the Social Security Administration's Office of Hearings and Appeals denied Plaintiff's request for review, thus rendering the ALJ's decision final. [Tr. 5-8]. Plaintiff filed the instant action on June 9, 2008. **[DE-5]**.

## **Standard of Review**

This Court is authorized to review the Defendant's denial of benefits under 42 U.S.C. § 405(g), which provides in pertinent part:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . .

Id.

"Under the Social Security Act, [the Court] must uphold the factual findings of the Secretary if they are supported by substantial evidence and were reached through application of the correct legal standard." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996). "Substantial evidence is . . . such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). "It consists of more

than a mere scintilla of evidence but may be somewhat less than a preponderance." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir.1966). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." Craig, 76 F.3d at 589. Thus, this Court's review is limited to determining whether the Defendant's finding that Plaintiff was not disabled is "supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir.1990).

## **Analysis**

The Social Security Administration has promulgated the following regulations which establish a sequential evaluation process which must be followed to determine whether a claimant is entitled to disability benefits:

> The five step analysis begins with the question of whether the claimant engaged in substantial gainful employment. 20 C.F.R. § 404.1520(b). If not, the analysis continues to determine whether, based upon the medical evidence, the claimant has a severe impairment. 20 C.F.R. § 404.1520(c). If the claimed impairment is sufficiently severe, the third step considers whether the claimant has an impairment that equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations. 20 C.F.R. § 404.1520(d); 20 C.F.R. Part 404, subpart P, App. I. If so the claimant is disabled. If not, the next inquiry considers if the impairment prevents the claimant from returning to past work. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a). If the answer is in the affirmative, the final consideration looks to whether the impairment precludes the claimant from performing other work. 20 C.F.R. § 404.1520(f).

Mastro v. Apfel, 270 F.3d 171, 177 (4th Cir. 2001).

In the instant action, the ALJ employed the five step evaluation. First, the ALJ found

3

that Plaintiff is no longer engaged in substantial gainful employment. [Tr. 18]. At step two, the ALJ determined that Plaintiff suffered from the following severe impairments: 1) hypertension; 2) diabetes mellitus, and 3) mild disc herniation. [Tr. 18]. In completing step three, however, the ALJ concluded that Plaintiff does not have an impairment or combination of impairments that meet or medically equals one of the listed impairments of 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926)). [Tr. 19]. Specifically, the ALJ noted that although Plaintiff has hypertension, she has not been diagnosed with chronic heart failure, hypertensive cardiovascular disease, or ischemic heart disease consistent with Listings 4.02, 4.03 or 4.04. [Tr. 19].

In addition, with regards to Plaintiff's diabetes mellitus, the ALJ opined that this condition has not resulted in: 1) any neuropathy demonstrated by significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station; 2) any acidosis occurring at least on average once every two months documented by appropriate blood chemical tests; or 3) retinitis proliferans. [Tr. 19]. Consequently, the ALJ concluded that Plaintiff's diabetes mellitus does not meet or equal the criteria for listing 9.08. [Tr. 19].

Furthermore, for Plaintiff's disc herniation, the ALJ found that it had not resulted in the compromise of a nerve root (including the cauda equina) or the spinal cord. [Tr. 19].

There was also no evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, or motor loss (atrophy associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss. [Tr. 19]. As a result, the ALJ concluded that Plaintiff's disc herniation does not meet or equal the criteria for listing 1.04. [Tr. 19].

The ALJ then proceeded with step four of his analysis and determined that Plaintiff retained the residual functional capacity ("RFC") to: lift and carry up to ten pounds frequently and twenty pounds occasionally, to stand and walk for up to six hours in an eight-hour workday, and to sit for up to six hours in an eight-hour workday with a sit/stand option. [Tr. 19]. In addition, Plaintiff would need to elevate her feet for one hour a day, she would be limited to occasionally climbing stairs and crouching, she could never balance, crawl, work around unprotected heights, or excess cold, and she would have difficulty maintaining concentration for more than two hours. [Tr. 19].

Plaintiff' past relevant work includes jobs as a nursing assistant, stock clerk, potato grader, machine feeder, and laundry worker. [Tr. 22]. A Vocational Expert ("VE") testified at the hearing that based on Plaintiff's RFC, she "could not return to her past relevant work as she previously performed these jobs and as they are generally performed in the national economy." [Tr. 22]. However, the VE also testified that Plaintiff could perform other jobs that existed in significant numbers in the national economy. [Tr. 23]. After taking all of these

factors into account, at step five of his analysis, the ALJ concluded that a finding of "not disabled" was appropriate under Medical-Vocational Rule 202.21. [Tr. 23-24]. The undersigned shall now summarize the medical record relied upon by the ALJ.

Plaintiff was born on February 3, 1955, and was 48 years old on her alleged disability onset date, July 24, 2003. [Tr. 23, 65]. Plaintiff's records indicate that she was seen at the Wilson Medical Center emergency department on this date following a motor vehicle accident. [Tr. 171-75]. During her visit, she complained of sharp pain in her neck and upper back. [Tr. 171]. On examination, she denied numbness, tingling, and radiating pain, her skin was intact, and her neck was soft and supple. [Tr. 171]. In addition, her straight leg raising was negative, she could move all of her extremities, and her gait was within normal limits. [Tr. 171, 173]. The treating physician diagnosed her with back and neck strain, and prescribed Ibroprofen, Lortab, and Flexeril for treatment. [Tr. 171, 175]. She was released the same day in stable condition and directed to follow-up with her family physician. [Tr. 175].

Shortly after her emergency room visit, Plaintiff was evaluated by Dr. Hoke V. Bullard on September 18, 2003, for Disability Determination Services. [Tr. 152]. During the evaluation, Plaintiff reported that she no longer works because she has pain in her back and neck following her motor vehicle accident in July 2003, and she also had been having pain in both feet for almost a year. [Tr. 152]. In addition, Plaintiff indicated that she was

having problems with recurrent epigastric pain radiating into her chest, and constipation. [Tr. 152]. Furthermore, Plaintiff stated that she had been told that she had arthritis in her neck (unrelated to the accident), and a ligamental strain and sprain in her low back. [Tr. 152]. She mentioned that the low back pain did not radiate down either of her lower extremities, but it did prevent her from lifting more than ten to fifteen pounds at a time, and on an occasional basis, standing possibly 45 minutes. [Tr. 152]. However, she could sit for long periods of time with no problem as long as she had a comfortable place to sit. [Tr. 152].

On examination, Dr. Bullard observed that Plaintiff did not have edema, cyanosis, or clubbing in her extremities, her grip strength was normal, she had normal muscle strength 5/5 in all muscle groups, she could tandem walk normally, and squat and rise without any assistance. [Tr. 154]. In addition, she did not have any atrophy, could stand on her tip toes and heels, and could bend at the waist with her knees straight and touch her toes. [Tr. 154]. Furthermore, Dr. Bullard indicated that Plaintiff was covered with warty protuberances on her skin. [Tr. 154]. Plaintiff reported that she had been told that the warts were neurofibromatosis.[1] [Tr. 154]. She also reported that she was not born with the protuberances, but they became more apparent when she was pregnant. [Tr. 154].

Based on his examination, Dr. Bullard opined that Plaintiff had low back pain caused

---

[1] There are two types of neurofibromatosis: type 1 (peripheral neurofibromatosis, von Recklingshausen's disease) and the rarer type two (central neurofibromatosis). One third of patients with type 1 are asymptomatic and identified during routine examination; one third present with cosmetic problems, and one third with neurologic problems. [DE-18, p. 4, n. 1] (citing The Merck Manual, 1496 (17th Ed. 1999)). Plaintiff's record indicate that she has type 1 neurofibromatosis. [Tr. 155, 268, 270, 273].

7

by her motor vehicle accident that was probably due to back strain or sprain; she also had probable plantar fascitiis, uncontrolled hypertension, gastroesophageal reflux disease, and neurofibromatosis (also known as Recklinghaursen's disease). [Tr. 155].

Shortly after Dr. Bullard's examination, Plaintiff was evaluated by DDS medical consultant Dr. William Farley on September 29, 2003. [Tr. 157-64]. Based on his examination, Dr. Farley concluded that Plaintiff is capable of light exertion. [Tr. 164]. Specifically, she can: 1) occasionally lift and/or carry twenty pounds; 2) frequently lift and/or carry ten pounds, 3) stand and/or walk about six hours in an eight-hour workday; 4) perform an unlimited amount of pushing and/or pulling. [Tr. 158]. Dr. Farley also concluded that Plaintiff did not have any postural, manipulative, visual, communicative, or environmental limitations. [Tr. 159-61]. Subsequently, on January 15, 2004, DDS medical consultant, Dr. Robert Gardner, affirmed Dr. Farley's findings. [Tr. 167].

On October 14, 2003, Plaintiff was examined by Dr. Fatima Dalawi, with complaints of low back pain and pain in her feet. [Tr. 21, 187]. Plaintiff reported that she had received treatment for her back pain from a chiropractor for the past two months, but did not have any significant improvement in her condition. [Tr. 21, 187]. Plaintiff also indicated that she was not taking any medications for her pain. [Tr. 21, 187]. On examination, Dr. Dalawi noted that Plaintiff had paraspinal tenderness in the thoracic region, tenderness over the L-2-3-4 spinous processes, and tenderness in the lumbar area. [Tr. 187]. In addition, her straight leg raise was

8

positive at 60 degrees, she had 5/5 strength bilaterally, and her sensation was intact. [Tr. 187]. The doctor concluded that Plaintiff's low back pain was most likely a muscle strain and prescribed Ibuprofen and Flexeril for treatment. [Tr. 21, 187]. The doctor also diagnosed Plaintiff with bilateral heel pain, and recommended Ibuprofen for this condition as well. [Tr. 21, 187].

During a follow-up visit with Dr. Dalwai on October 28, 2003, Plaintiff reported that she had not experienced much improvement in her symptoms with the Ibuprofen. [Tr. 21, 186]. As a result, the doctor gave her samples of Vioxx to treat her low back pain. [Tr. 21, 186]. The doctor also diagnosed Plaintiff with bilateral heel pain that could be secondary to plantar fasciitis and advised her to take the Vioxx and wear tennis shoes to treat this condition. [Tr. 21, 186].

In addition to low back pain, Plaintiff also has a history of hypertension and was treated for this condition at the Wilson Community Health Center ("the Center"). [Tr. 21]. During her visit with Dr. Dalawi on October 28, 2003, her blood pressure reading was 160/112. [Tr. 21, 186]. The doctor noted that Plaintiff's hypertension was uncontrolled and gave Plaintiff samples of Lisinopril and Tenoretic for treatment. [Tr. 186]. Several months later, when Plaintiff was examined by Dr. Narender Arcot on December 17, 2003, her blood pressure reading was 120/78. [Tr. 183]. Dr. Arcot opined that Plaintiff's hypertension was under good control, and she was instructed to continue with the management program that

9

had been recommended by Dr. Dalawi. [Tr. 21, 183].

On December 22, 2003, Dr. Arcot did an x-ray on Plaintiff's cervical spine. [Tr. 21, 214]. The x-ray revealed that Plaintiff had minimal degenerative changes at the C5-6 level, and no evidence of fracture, subluxation or prevertebral soft tissue swelling. [Tr. 21, 214]. Dr. Arcot's impression of the x-ray results was that there was minimal cervical spondylosis without evidence of acute injury. [Tr. 21, 214]. Several months later, on February 6, 2004, Dr. Arcot performed an x-ray on Plaintiff's lumbar spine, which revealed that Plaintiff's lumbar spine was normal. [Tr. 21, 168].

On August 15, 2005, Plaintiff was evaluated again by Dr. Bullard for the Disability Determination Services. [Tr. 21, 217-20]. During his examination, Dr. Bullard noted that he had evaluated Plaintiff once before, in September 2003, but little had changed in her conditions since that time. [Tr. 217]. Based on his observations, he concluded that Plaintiff had multiple neurofibromatosis, low back and neck pain, plantar fasciitis, and uncontrolled hypertension. [Tr. 21, 219]. He also opined that Plaintiff could lift 10 to 15 pounds on an occasional basis, stand 45 minutes without getting off her feet, sit all day if the accommodations were comfortable, and ride public transportation. [Tr. 21, 219].

A few days after Dr. Bullard's evaluation, Plaintiff was examined for a Physical RFC assessment by Dr. Frank Virgili on August 19, 2005. [Tr. 21, 221-28]. Dr. Virgili took into account Dr. Bullard's evaluation. [Tr. 227]. However, his findings differed from Dr.

10

Bullard's assessment in that he concluded that Plaintiff was capable of performing the following functions: 1) occasionally lift and/or carry up to fifty pounds; 2) frequently lift and/or carry up to twenty-five pounds; 3) stand, sit and/or walk about six hours in an 8-hour workday; 4) and do unlimited pushing and pulling. [Tr. 21, 222]. The doctor also concluded that Plaintiff did not have any postural, manipulative, visual, communicative, or environmental limitations. [Tr. 21, 223-25]. In his decision, the ALJ noted that he had considered Dr. Virgili's RFC assessment, "but decline[d] to adopt it in full because it fails to give sufficient consideration to the claimant's impairments and limitations arising therefrom, and did not take into account subsequent medical evidence." [Tr. 21].

Several months after Dr. Virgili's assessment, on March 6, 2006, Plaintiff was examined by Dr. Arcot. [Tr. 21, 246-47]. She complained of continued back pain and stated that she had stopped taking her blood pressure medication on her own. [Tr. 21, 246]. Her blood pressure reading was 150/90. [Tr. 21, 246]. Dr. Arcot diagnosed her with diabetes mellitus and prescribed metformin. [Tr. 21, 246]. He also noted that her blood pressure was elevated. [Tr. 247]. The doctor advised Plaintiff that whenever she stops taking her medications on her own, she risks the chance of getting problems with uncontrolled hypertension. [Tr. 21, 247]. He discontinued her other hypertensive medications and started her on Cozaar. [Tr. 21, 247]. The doctor also diagnosed Plaintiff with degenerative disk disease of C-spine at C5-C6 and prescribed Naprosyn to treat this condition. [Tr. 21, 247].

On March 22, 2006, Plaintiff underwent an MRI, which revealed a mild paracentral disk herniation at L3-L4. [Tr. 21, 243]. She was instructed to continue with the Naprosyn for pain management. [Tr. 21, 243]. Several months later, on May 24, 2006, Plaintiff went for a follow-up visit at the Center. [Tr. 241]. Her treatment records indicate that her doctor diagnosed her with uncontrolled diabetes due to in part to her poor diet. [Tr. 241]. The doctor also noted that she was not adhering to her medication regimen. [Tr. 241]. Ultimately, the doctor recommended that Plaintiff avoid eating fried foods and limit her sweets intake to twice a week. [Tr. 241]. Plaintiff was directed to come in for a follow-up visit in one month. [Tr. 241].

Despite the doctor's warnings, during a follow-up visit on June 29, 2006, Plaintiff reported that her intake of foods high in carbohydrates and fried foods had increased since her last visit and her level of exercise had remained unchanged. [Tr. 238]. The doctor instructed Plaintiff to restrict her carbohydrate intake and to increase her exercise to walking thirty minutes a day for at least three days a week. [Tr. 238].

Plaintiff was examined by Jessica H. McKee, D.O. from August 10, 2006 to May 29, 2007 for treatment of her hypertension, diabetes, and neurofibromatosis. [Tr. 21, 274- 277]. During her visit with Dr. McKee on August 10, 2006, she complained of chronic back pain, but said there was no radiation down her legs or leg weakness. [Tr. 276]. Dr. McKee noted that it was a brief, normal exam. [Tr. 277]. She also observed that Plaintiff's

12

neurofibromatosis was stable. [Tr. 277]. Shortly after this visit, Plaintiff returned to see Dr. McKee on September 11, 2006. [Tr. 274]. She complained of cramps in her hands and feet the previous night, but stated in general that she felt okay. [Tr. 274]. Dr. McKee diagnosed Plaintiff with hypertension, diabetes mellitus type II, hyperlipidemia, and neurofibromatosis. [Tr. 274].

During a follow-up visit on January 25, 2007, Plaintiff reported that she had gained weight, was not exercising, and was eating more. [Tr. 21, 272]. She also complained about the "moles from neurofibromatosis" and indicated that she was interested in getting the ones on her scalp removed because they hurt when she combed her hair. [Tr. 21, 272]. The doctor diagnosed her with hypertension, type II diabetes mellitus, and neurofibromatosis. [Tr. 21, 272]. For treatment of her hypertension, the doctor recommended that Plaintiff continue with her current medication regimen and limit her salt intake. [Tr. 21, 272]. To control Plaintiff's diabetes, the doctor recommended that Plaintiff continue her medication, and encouraged diet adherence and exercise. [Tr. 21, 272]. For removal of the moles caused by Plaintiff's neurofibromatosis, the doctor referred Plaintiff to Dr. Michael Halpert, a dermatologist. [Tr. 21, 273].

Notably, when Plaintiff went for a visit to see Dr. Kerrie Heron in April 2007, with complaints of a cough and a cold, Dr. Heron noted that Plaintiff had an appointment with Dr. Halpert, but did not keep that appointment. [Tr. 269-70]. As a result, Dr. Heron indicated

that she would refer Plaintiff to another dermatologist for the removal of her warts and moles. [Tr. 270]. A month later, on May 29, 2007, Plaintiff had a follow-up visit, with complaints of back pain and aching in her feet. [Tr. 21, 267]. Dr. Heron diagnosed her with back pain. [Tr. 268]. She also recommended using a heating pad for treatment, and physical therapy if there was no improvement. [Tr. 21, 268]. The treatment notes also indicate that Plaintiff was scheduled to see a dermatologist in June 2007, for treatment of her neurofibromatosis. [Tr. 268].

During the hearing in this matter, Plaintiff testified that she had back, neck, and foot pain. [Tr. 20, 310, 314, 316]. She reported that she had been taking prescribed medication for the pain, but it did not totally alleviate the symptom. [Tr. 20, 310]. She also indicated that because she has diabetes, she takes oral medication to keep her blood sugar under control. [Tr. 20, 313]. However, she has not had any side effects from taking these medications. [Tr. 20, 312 ]. Plaintiff also stated that she could sit comfortably for fifteen minutes, walk for four blocks, and lift five pounds, but when she was standing, she had to move around. [Tr. 20, 310, 312, 316]. Some of her daily activities include watching television, reading, entertaining company, going to church, and enjoying family cookouts. [Tr. 20, 312, 314, 317, 318].

With regards to Plaintiff's testimony, the ALJ made the following findings:

After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected

14

to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

. . . .

Specifically, the claimant does not have any significant anatomical structural deformities and there is no evidence of ongoing nerve root compression which might be expected based on the degree of pain alleged. Further, the claimant has not required such aggressive measures for symptom relief as use of steroid medication, epidural injections, application of TENS equipment, or enrollment in physical therapy or a pain management program. The treatment regimen, therefore, indicates that the claimant's symptoms are not as intractable as alleged. These factors indicate that the claimant's allegations of functional restrictions are not entirely credible.

[Tr. 20, 22].

To assist the ALJ in assessing what kind of work Plaintiff could perform in the national economy, he employed the testimony of VE, Julie Sawyer-Little. [Tr. 22, 321-330]. Ms. Little testified that Plaintiff's past relevant work involved the following jobs: nursing assistant, stock clerk, potato grader, machine feeder, and laundry worker. [Tr. 22, 323]. The VE opined that based on her current limitations, Plaintiff would not be able to return to her past relevant work "as she previously performed these jobs and as they are generally performed in the national economy." [Tr. 22, 326-27]. Thus, to determine the extent to which Plaintiff's limitations "erode[d] the unskilled light occupational base," the ALJ asked the VE whether there were any other jobs in the national economy that Plaintiff could perform based on her background and RFC. [Tr. 23, 327]. The VE testified that based on her abilities, Plaintiff would be able to perform the requirements of representative occupations

15

such as a cashier, photocopy machine operator, and office helper. [Tr. 23, 327-28]. The VE's testimony was consistent with information contained in the Dictionary of Occupational Titles. [Tr. 23].

After weighing Plaintiff's and the VE's testimony, the ALJ concluded that Plaintiff could not return to her past relevant work. [Tr. 22]. However, the ALJ also concluded that Plaintiff is "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." [Tr. 24]. Accordingly, the ALJ found that Plaintiff had not been under a disability, as defined by the Social Security Act, from July 24, 2003, through the date of his decision. [Tr. 24].

In her assignments of error, Plaintiff argues, *inter alia*, that the ALJ's failure to discuss, consider, or evaluate a form signed by her treating physician, Dr. Kara Soebbing, is reversible error.[2] **[DE-16, pgs. 5-6]**. The form in question is entitled "Physician Authorization for Certification and Treatment (PACT) Form" and it was completed by Gloria Patterson, a registered nurse on March 15, 2007. [Tr. 263-66]. In the form, Ms. Patterson indicated that because of Plaintiff's diabetes and hypertension, she would assistance with various activities of daily living. [Tr. 264-65]. Dr. Soebbing approved Ms. Patterson's recommendations on April 12, 2007. [Tr. 266]. Thus, Dr. Soebbing essentially opines in this

---

[2] In her brief, Plaintiff indicates that it was Dr. Kerrie Heron that signed off on the form in question [DE-16, pgs. 5-6], however, the medical records reveal that Dr. K. Sobbing was the attending physician that was listed on the form [Tr. 263], and the one that signed off on Plaintiff's care. [Tr. 266].

16

form that Plaintiff's impairments are severe enough that she would benefit from assistance in her activities of daily living. Despite the relevance of this opinion to the determination of Plaintiff's disability status, the ALJ fails to discuss it in his decision. Because the ALJ failed to analyze Dr. Soebbing's opinion, the undersigned cannot find that the ALJ's decision was supported by substantial evidence. Specifically:

> The courts . . . face a difficult task in applying the substantial evidence test when the Secretary has not considered all relevant evidence. Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's "duty to scrutinize the records as a whole to determine whether the conclusions reached are rational."

Arnold v. Sec'y of Health, Educ. & Welfare, 567 F.2d 258, 259 (4th Cir. 1977) (quoting Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974)). As a result, this case should be remanded for further proceedings to determine what consideration the ALJ gave to the recommendations in the PACT form. Based on this finding, the undersigned declines to address Plaintiff's other assignments of error.

## Conclusion

Because the ALJ failed to fully discuss the opinions of Plaintiff's treating physician, it is HEREBY RECOMMENDED that Plaintiff's Motion for Judgment on the Pleadings **[DE-15]** be GRANTED, and that the Defendant's Motion for Judgment on the Pleadings **[DE-17]** be DENIED. Specifically, it is RECOMMENDED that Defendant's final decision be REVERSED AND REMANDED to permit an ALJ to make specific findings regarding

17

the treating physician's opinion in the PACT form..

SO RECOMMENDED in Chambers at Raleigh, North Carolina this 16th day of December, 2008.

_____
William A. Webb
U.S. Magistrate Judge